United States District Court
Southern District of Texas
**ENTERED**
March 17, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEVION ROGERS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-2330 |
| | § | |
| JEFFREY JARRETT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are a joint motion for summary judgment filed by Defendants Jeffrey Jarrett ("Jarrett") and Jeremy Bridges ("Bridges") (Dkt. 20) and a separate motion for summary judgment filed by their employer, Defendant Texas Department of Criminal Justice ("TDCJ"). (Dkt. 17) Jarrett, Bridges, and TDCJ are the only three defendants. The Court has considered the parties' briefing, the summary judgment record, the applicable law, and the other filings on the Court's docket. The motion filed by Jarrett and Bridges is **GRANTED**. The motion filed by TDCJ is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 ("Section 1983") and **DENIED AS MOOT** as to Plaintiff's claims under the Texas Tort Claims Act ("the TTCA"). Plaintiff's claims under the Eighth and Fourteenth Amendments to the United States Constitution are **DISMISSED WITH PREJUDICE**. The Court declines to

exercise supplemental jurisdiction over Plaintiff's claims under the TTCA, and Plaintiff's

TTCA claims are **REMANDED** to the 278th District Court of Madison County, Texas.[1]

## BACKGROUND

Plaintiff Kevion Rogers ("Rogers") suffered a closed traumatic brain injury when a piece of a drop ceiling fell on his head while he was working in a hog barn at TDCJ's Ferguson Unit in Madison County. The problem with the barn's ceiling evidently stemmed from a leaking pipe or water hose connection. When he was injured, Rogers was classified as a low-risk "G1" inmate, meaning that he was allowed to live in a dormitory outside the prison unit's security fence and was allowed to work outside the security fence with periodic unarmed supervision. (Dkt. 26-3 at p. 25)[2] Rogers was in the hog barn working on a task assigned by Jarrett, a TDCJ agricultural specialist, when the ceiling piece fell; but neither Jarrett nor any other TDCJ officer was in the barn at the time. Bridges, the other individual defendant in this case, supervised Jarrett and Jarrett's subordinate, William Schmidt ("Schmidt").

The facts outlined below are either uncontroverted or drawn from Rogers's summary judgment evidence and taken as true. On the morning that Rogers was injured, Jarrett, as was typical, began the workday by getting the inmates whom he supervised out of their dormitories and taking them to the hog barns. (Dkt. 27-1 at pp. 3–5) Jarrett then began his morning count of the pigs. (Dkt. 27-1 at p. 5) During the morning count, Jarrett

---

[1] The state-court case is cause number 19-16359 in the 278th District Court of Madison County, Texas.
[2] The Court has taken judicial notice of TDCJ's general description of a G1 inmate, which can be found in the TDCJ Offender Orientation Handbook on the TDCJ website.

entered one of the hog barns and saw that "[t]here was water coming out of the ceiling" and that part of the drop ceiling had fallen to the floor (Dkt. 27-1 at pp. 5–8) Another piece of a drop ceiling tile was hanging down from the area of the water leak. (Dkt. 27-1 at pp. 6–7) It had not rained recently, so Jarrett believed that the leak was coming from "[t]he water hose flow[.]" (Dkt. 27-1 at p. 5) Jarrett shut off the water to the hog barn and removed the piece of tile that was hanging. (Dkt. 27-1 at pp. 5–7) This left a small hole in the drop ceiling; Jarrett testified that "[i]t's like the false tile ceiling. It's like that, like there was a piece of tile missing." (Dkt. 27-1 at p. 8) However, Jarrett further testified that "[t]he rest of the ceiling was fine" and that he did not think that there was any problem with the remainder of the drop ceiling that required immediate attention. (Dkt. 27-1 at pp. 6–7, 13) Jarrett testified that he had not previously seen any problems with roof leaks in any of the hog barns. (Dkt. 27-1 at p. 6) Bridges testified that some work had been done on the barn's ceiling "a couple of months prior to the accident" to "[p]rovide better ventilation for the sows and the babies[,]" but he echoed Jarrett's testimony that roof leaks had not been a problem in the hog barns in the past. (Dkt. 27-2 at p. 4)

After shutting off the water to the barn and removing the hanging piece of tile, Jarrett left the barn and "went back to [his] job doing the rest of [his] daily schedule[,]" which began with "weaning a barn" and "doing [his] paperwork." (Dkt. 27-1 at pp. 6–7) At about 8:30 a.m., Jarrett told Rogers to go into the barn to get Disrupt, which Jarrett described in his deposition as "a powder that we put on the babies to dry them off and keep them from getting sick." (Dkt. 27-1 at p. 7; Dkt. 27-3 at p. 25; Dkt. 27-5 at p. 2)

Rogers went to a storage room in the barn, looked for the Disrupt, "saw that it was not there, and turned around to leave the barn." (Dkt. 27-5 at p. 2) As Rogers was leaving the barn, part of the barn's ceiling fell and hit him on the head. (Dkt. 27-5 at p. 2) Rogers briefly blacked out. (Dkt. 27-5 at pp. 2–3)

"Shortly thereafter," Rogers came to; and Casey Turner ("Turner"), another inmate who was working in the barn, took Rogers to Jarrett's office, where Rogers "informed Jarrett that [he] was seriously injured." (Dkt. 17-3 at p. 26; Dkt. 27-1 at p. 16; Dkt. 27-5 at p. 3) Rogers "told [Jarrett] that the ceiling had collapsed on [him] causing [him] to black out." (Dkt. 27-5 at p. 3) Jarrett responded, "Well you look alright, I mean you don't look hurt . . . what . . . you wanna see a doctor or something?" (Dkt. 27-5 at p. 3) (quotation marks omitted; ellipses in original) Rogers replied, "Yes I need to go to the infirmary, the hell, a whole ceiling just fell on me!" (Dkt. 27-5 at p. 3) (quotation marks omitted)[3] Rogers "had dust on him" but did not have any visible injuries. (Dkt. 27-1 at p. 13)[4] Rogers spoke without slurring his speech, walked normally into and out of Jarrett's office, and "looked fine" during his brief conversation with Jarrett. (Dkt. 27-1 at p. 13)[5]

---

[3] Jarrett disputes Rogers's account of this exchange. Jarrett testified that he "asked [Rogers] if he was okay, if he'd been hit, if he needed to go to the infirmary" and that "[Rogers] said no." (Dkt. 27-1 at p. 7) The Court must credit Rogers's account at this stage of the case.

[4] The next day, unit medical personnel noted that Rogers had an abrasion on his left knee. (Dkt. 21-1 at p. 13)

[5] During TDCJ's internal investigation of the incident, one of Rogers's fellow inmates, who was outside the barn when the ceiling fell, provided a written statement indicating that he saw Rogers "stagger" out of the barn and then "walk over to [Jarrett's] office, dusting himself off." (Dkt. 27-2 at p. 18) Turner provided a statement indicating that he saw Rogers stagger out of the barn, but Turner's statement did not say anything about how Rogers looked walking into and out of Jarrett's office. (Dkt. 27-2 at p. 17) Rogers's summary judgment affidavit does not controvert Jarrett's testimony that Rogers was walking normally when he entered and left Jarrett's office. In short, even if Rogers staggered out of the barn, there is no evidence controverting Jarrett's

Jarrett told Rogers to keep looking for the Disrupt, and Rogers and Turner left Jarrett's office to continue looking for it. (Dkt. 27-1 at p. 9; Dkt. 27-5 at p. 3) Rogers "walked away and sat down as [he] was lightheaded." (Dkt. 27-5 at p. 3) Rogers and Jarrett did not see each other again that morning.

At some point between 9:30 a.m. and 10:00 a.m., Jarrett's job responsibilities required him to leave the Ferguson Unit. (Dkt. 27-1 at p. 7) Jarrett had to take a load of pigs from the Ferguson Unit; drive to the Ellis Unit, where he picked up more pigs; and then deliver the combined Ferguson/Ellis load of pigs to the Eastham Unit. (Dkt. 27-1 at p. 16; Dkt. 27-2 at p. 12) Jarrett's departure left Rogers and his fellow inmates unsupervised until Schmidt arrived at approximately 10:00 a.m. (Dkt. 17-3 at p. 19) Before Schmidt arrived, Rogers "asked one of the inmates to go see if Jarrett called the infirmary" and was told that Jarrett had left. (Dkt. 27-5 at p. 3) Rogers was "sitting and going in and out of consciousness," and other inmates were trying to keep him awake. (Dkt. 27-5 at p. 3)

When Schmidt arrived, he did a count of the inmates who were working at the hog barn. (Dkt. 17-3 at p. 19) At about 10:20 a.m., Schmidt called all of the inmates to the hog barn office to get ready for lunch. (Dkt. 17-3 at p. 19) Schmidt gave the inmates their identification cards and began loading them into his truck to take them to lunch. (Dkt. 17-3 at p. 19) There were too many inmates for Schmidt to transport at once, so he made two trips. (Dkt. 17-3 at p. 19) On the second trip, Rogers "told [Schmidt] the ceiling collapsed

---

testimony that Rogers "looked fine" and walked normally when he entered and left Jarrett's office.

on [his] head and showed Schmidt the debris." (Dkt. 27-5 at p. 3) Rogers asked for medical attention, and at 11:10 a.m. Schmidt informed Bridges over the radio "that the ceiling had fallen on [Rogers's] head and that [Rogers] had sustained a head injury." (Dkt. 17-3 at p. 17; Dkt. 27-5 at p. 3) Bridges "responded that [Rogers] should be taken back to [his] bunk and that Bridges would take a look at [Rogers] later." (Dkt. 27-5 at p. 4)

Rogers was taken to the building where his bunk was located. (Dkt. 27-5 at p. 4) By this point, he was wheezing, he had mucus draining, his face was bruising, and his eye and head were swelling. (Dkt. 27-5 at p. 4) At about 11:45 a.m., a correctional officer named Gerald Havens ("Havens") noticed that Rogers was "acting abnormal" and sent him to the Ferguson Unit's administrative building. (Dkt. 17-3 at pp. 9, 21) Havens notified Lieutenant Latwala Molett ("Molett") at the administrative building about Rogers. (Dkt. 17-3 at pp. 9, 21)

Rogers, assisted by two other inmates, walked to the administrative building, where he collapsed on the front lawn. (Dkt. 17-3 at pp. 9, 21) Rogers "began to seize violently, began vomiting, and lost consciousness." (Dkt. 27-5 at p. 4) A few minutes later, at about 11:57 a.m., Molett walked out of the administrative building, saw Rogers, and radioed for medical assistance. (Dkt. 17-3 at pp. 9, 21) Ferguson Unit medical personnel arrived on the scene at about noon, called 911, and cared for Rogers until Emergency Medical Services ("EMS") arrived at about 12:15 p.m. (Dkt. 21-1 at p. 17) EMS left with Rogers in a helicopter at about 12:55 p.m. and transported him to a nearby hospital. (Dkt. 21-1 at p. 17)

After a CT scan, Rogers was diagnosed at the hospital with a "traumatic brain injury; no hemorrhage." (Dkt. 17-3 at pp. 9–10; Dkt. 21-1 at p. 10) The next day, Rogers was returned to the Ferguson Unit, where unit medical personnel prescribed pain medication and anti-nausea medication for him. (Dkt. 21-1 at pp. 10–14) There is no evidence in the record of subsequent problems or complications.

Rogers sued Jarrett, Bridges, and TDCJ in Texas state court under Section 1983 and sued TDCJ under the TTCA. The defendants removed the case to this Court under the federal-question jurisdiction statute, 28 U.S.C. § 1331. (Dkt. 1 at p. 1) Under Section 1983, Rogers alleges that the defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by showing deliberate indifference to his safety and his medical needs. (Dkt. 1-5 at pp. 9–12) Under the TTCA, Rogers alleges a premises-liability theory. (Dkt. 1-5 at pp. 7–9) The defendants have moved for summary judgment on all claims.

## SUMMARY JUDGMENTS AND QUALIFIED IMMUNITY

### A.    Rule 56

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id*. at 322–23.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted). In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

## B.    Qualified Immunity

The motion for summary judgment filed by Jarrett and Bridges invokes qualified immunity. In civil rights actions such as this one where the non-movant is suing a

government official, the issue of qualified immunity alters the summary judgment analysis. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). If the qualified immunity defense is raised, the burden shifts to the non-movant to rebut it. *Id*. All inferences are still drawn in the non-movant's favor. *Id*.

"The qualified immunity defense has two prongs: whether an official's conduct violated a statutory or constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Id*. For the right to have been clearly established for purposes of qualified immunity, the contours of the right must have been sufficiently clear that a reasonable official would have understood that what he was doing violated that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). The unlawfulness of the official's actions must have been readily apparent from sufficiently similar situations, though there need not have been commanding precedent holding the very action in question unlawful. *Id*. at 236–37. The first prong of the qualified immunity analysis is governed by current law, while the second prong is governed by the law as it was clearly established at the time of the conduct in question. *Petta v. Rivera*, 143 F.3d 895, 899–900 (5th Cir. 1998). The legal standards can, and sometimes will, conflict; but both prongs must be satisfied. *Id*.

Qualified immunity "establishes a high bar"—*Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013)—that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Essentially, a plaintiff must demonstrate that no reasonable official could have believed that his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

## SECTION 1983

Rogers has sued the defendants under Section 1983, claiming that they violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and showed deliberate indifference to his safety and his medical needs by sending him into the hog barn and then failing to send him to the infirmary after a piece of the barn's ceiling hit him in the head. Section 1983 allows a person to sue for a violation of Constitutional rights that is committed by a person acting under color of state law. *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995).

Rogers's claims under Section 1983 fail. TDCJ is immune from suit under Section 1983, *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998), and Rogers has not presented competent summary judgment evidence that would allow a reasonable jury to find that Jarrett and Bridges violated his Constitutional rights.

### A. Rogers has not presented evidence showing that Jarrett and Bridges were deliberately indifferent to his safety.

First, Rogers's summary judgment evidence does not establish that Jarrett and Bridges showed deliberate indifference to his safety by sending him into the hog barn. Under the Eighth Amendment, prisoners have a right to "humane conditions of confinement[,]" and prison officials are required to provide the prisoners with adequate food, shelter, clothing, and medical care. *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (quotation marks omitted). Prison officials must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, the Eighth Amendment mandates *reasonable* safety, not *absolute* safety; and

prison officials are not liable when they make good-faith errors in assessing a potential danger. *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998). Not every injury suffered by a prisoner translates into Constitutional liability for prison officials responsible for the inmate's safety. *Farmer*, 511 U.S. at 834. Rather, Rogers must show that Jarrett and Bridges were deliberately indifferent to his safety. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

The standard for deliberate indifference is extremely high and requires more than a showing that the defendants were negligent or mistaken in their judgment. *Id*.; *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 1999). Establishing deliberate indifference, in fact, requires even more than a showing of gross negligence. *Whitley v. Hanna*, 726 F.3d 631, 641 (5th Cir. 2013) (pointing out that gross negligence is "a heightened degree of negligence" while deliberate indifference is "a lesser form of intent") (quotation marks omitted). To establish deliberate indifference in a prison conditions case, a prisoner must show that the prison officials: (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) actually drew an inference that such potential for harm existed. *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999). The deliberate-indifference standard is designed to be stringent enough to separate acts or omissions that amount to intentional choices from those that are merely unintentionally negligent oversights. *Southard v. Tex. Bd. Of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997). To that end, it draws on the test for "subjective recklessness" used in criminal law, which "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is

aware" and does not permit such a finding based on mere "failure to alleviate a significant risk that [the person] should have perceived but did not[.]" *Farmer*, 511 U.S. at 836–40.

In short, it would not be enough for Rogers to establish that he was injured by the negligence, or even the gross negligence, of Jarrett and Bridges. In order to establish an Eighth Amendment violation, Rogers must show that Jarrett and Bridges knowingly exposed him to and consciously disregarded a substantial risk of serious harm. *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).

There is no evidence in the record establishing that Jarrett and Bridges were deliberately indifferent to Rogers's safety. When he discovered the water leak, Jarrett shut off the water to the barn and removed the part of the ceiling that he thought had been affected by the leak. Jarrett testified that "[t]he rest of the ceiling was fine" and that he did not think that there was any problem with the remainder of the drop ceiling that required immediate attention. (Dkt. 27-1 at pp. 6–7, 13)  There is no evidence in the record showing that Jarrett's corrective measures were so obviously inadequate that his failure to take further action amounted to deliberate indifference, as opposed to a good-faith error in assessing the extent of the water damage and the state of the ceiling. There is also no evidence that roof leaks had been a problem in the hog barns in the past or that any inmates had previously been endangered by any problems with the ceilings in the hog barns. "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." *Hegmann*, 198 F.3d at 159 (quotation marks omitted). However, no evidence in this summary judgment

record establishes that the ceiling posed such an obvious risk when Rogers entered the barn that Jarrett's knowledge of the extent of the risk can be inferred. As for Bridges, he was not at the hog barn, had no apparent involvement in Jarrett's decision to send Rogers into the hog barn, and cannot be held liable solely on account of his position as Jarrett's supervisor. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1982) ("Personal involvement is an essential element of a civil rights cause of action.").

Jarrett and Bridges are entitled to qualified immunity on Rogers's claims that Jarrett and Bridges showed deliberate indifference to his safety by sending him into the hog barn.

### B. Rogers has not presented evidence showing that Jarrett and Bridges were deliberately indifferent to his medical needs.

The deliberate-indifference standard also applies to Rogers's claim that Jarrett and Bridges should have sent him to the infirmary after the piece of drop ceiling hit him in the head. A prisoner may succeed on a claim under Section 1983 for inadequate medical care only if he demonstrates "deliberate indifference to serious medical needs" on the part of prison officials or other state actors. *Estelle*, 429 U.S. at 104. The conduct alleged must "constitute an unnecessary and wanton infliction of pain" or "be repugnant to the conscience of mankind." *Id*. at 104–06 (quotation marks omitted). As previously noted, deliberate indifference is an "extremely high standard to meet." *Domino*, 239 F.3d at 756. "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally

negligent oversight." *James v. Harris County*, 577 F.3d 612, 617–18 (5th Cir. 2009) (quotation marks omitted).

The analysis of a claim of inadequate medical care proceeds in four steps. The prisoner must first prove objective exposure to a substantial risk of serious harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). To then prove subjective deliberate indifference to that risk, the prisoner must show both: (1) that the defendant was aware of facts from which the inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) that the defendant actually drew the inference that such potential for harm existed. *Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). The prisoner must then prove that the defendant, despite actual subjective knowledge of the substantial risk, denied or delayed the prisoner's medical treatment. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019). The plaintiff must finally prove that the delay in or denial of medical treatment resulted in substantial harm, such as suffering additional pain. *Id*.

Rogers's claim fails at the second step. Even though they knew that Rogers had been hit in the head, there is no evidence showing that Jarrett and Bridges were subjectively aware that Rogers had suffered a traumatic brain injury before Rogers collapsed. *See id*. at 249 n.31 ("Petzold's substantial risk of bodily harm is his fractured ankle, not his limp."). Although Rogers eventually exhibited severe symptoms indicating a possible brain injury (namely seizures, vomiting, and loss of consciousness), those symptoms did not materialize until several hours after he was struck in the head, long after his brief conversation with Jarrett. There is no evidence in the record showing that

Rogers exhibited such symptoms when he told Jarrett that the ceiling had fallen on him; to the contrary, Jarrett testified that, when he and Rogers talked, Rogers had no visible injuries, was not slurring his words, walked normally, and "looked fine."[6] (Dkt. 27-1 at p. 13) Even Rogers's own account of the conversation indicates that Rogers was coherent, if angry. (Dkt. 27-5 at p. 3) Medical records show that Rogers might have had an abrasion on his left knee at the time (Dkt. 21-1 at p. 13), but there is no other evidence contradicting Jarrett's account of how Rogers appeared when the two spoke. And Bridges did not see Rogers at all until Rogers collapsed in front of the administrative building. (Dkt. 17-3 at p. 17) Before Rogers's collapse, Bridges only knew what Schmidt had told him over the radio: that a ceiling had collapsed on Rogers and that Rogers "had sustained a head injury." (Dkt. 17-3 at p. 17; Dkt. 27-5 at p. 3) There is no evidence showing that Jarrett and Bridges were subjectively deliberately indifferent to the risk of harm posed by Rogers's brain injury.

A comparison of this case with *Austin v. Johnson*, 328 F.3d 204 (5th Cir. 2003), illustrates why Rogers's evidence cannot establish a claim for deliberate indifference. In *Austin*, a minor who was sentenced to a day of boot camp for stealing a candy bar developed heat stroke and had to be transported by ambulance to a hospital, where he spent two weeks in treatment for various heat-stroke-related conditions. *Austin*, 328 F.3d at 206. The minor's parents sued the boot camp director and a drill sergeant. *Id.* at 206–07. The summary judgment evidence established that, during the day, the minor told the

---

[6] As noted earlier, even if Rogers staggered out of the barn, there is no evidence controverting Jarrett's testimony that Rogers "looked fine" and walked normally when he entered and left Jarrett's office.

director and drill sergeant that he was having difficulty performing the exercises and was feeling sick. *Id.* at 206. The minor was told to continue. *Id.* During an afternoon march, the minor collapsed several times and was left behind. *Id.* at 206, 210. The minor was taken inside at some time after 2:00 p.m. and began vomiting. *Id.* at 210. At 3:00 p.m., the minor lost consciousness. *Id.* Even though the minor never regained consciousness, the defendants waited until 4:42 p.m. to call an ambulance. *Id.* The Fifth Circuit found that the defendants were not entitled to qualified immunity. The Court held that, while "[b]efore 3:00 p.m., defendants' conduct was perhaps only negligent, . . . their failure to call an ambulance for almost two hours while [the minor] lay unconscious and vomiting r[ose] to the level of deliberate indifference." *Id.* Here, unlike the defendants in *Austin*, Jarrett and Bridges never saw Rogers when he was exhibiting the severe symptoms that led to his transfer to the hospital. There is no evidence that either Jarrett or Bridges saw any symptoms in Rogers comparable to the collapses on the march in *Austin*.

There is no evidence that would permit a jury to infer that Jarrett and Bridges had subjective knowledge of the severity of Rogers's condition before Rogers collapsed in front of the administrative building. Jarrett spoke to Rogers before Rogers's severe symptoms began to manifest, and Bridges did not see Rogers until just before Rogers's transfer to the hospital. Accordingly, Jarrett and Rogers are entitled to qualified immunity on Rogers's claim that Jarrett and Bridges should have sent him to the infirmary after the piece of drop ceiling hit him in the head.

The Court will dismiss all of Rogers's claims under Section 1983 with prejudice.

## SUPPLEMENTAL JURISDICTION

Having dismissed all federal causes of action in this case, the Court will decline to exercise supplemental jurisdiction over Rogers's TTCA claims and will deny TDCJ's motion for summary judgment on those claims as moot. Federal district courts have the discretion to decline to exercise supplemental jurisdiction over state-law claims; that discretion is guided by the statutory factors set forth in 28 U.S.C. § 1367(c) and the common-law factors of judicial economy, convenience, fairness, and comity. *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008).

The factors listed in 28 U.S.C. § 1367(c) are:

(1) the claim raises a novel or complex issue of State law;

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

(3) the district court has dismissed all claims over which it has original jurisdiction; or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

"These interests are to be considered on a case-by-case basis, and no single factor is dispositive." *Mendoza*, 532 F.3d at 346. The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial. *Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

Having considered the statutory and common-law factors, the Court will follow the general rule, decline to exercise supplemental jurisdiction over Rogers's TTCA

claims, and remand Rogers's TTCA claims to state court. In seeking dismissal of Rogers's TTCA claims, TDCJ argues: (1) that it did not receive pre-suit notice that was sufficient to satisfy the jurisdictional requirements of Section 101.101 of the Texas Civil Practice and Remedies Code; and (2) that Rogers has failed to produce evidence sufficient to raise a fact issue regarding TDCJ's actual knowledge of a dangerous condition under the standards set out in the TTCA and Texas caselaw. Acceptance or rejection of TDCJ's arguments will determine whether TDCJ's sovereign immunity remains intact under Texas state law. Under the circumstances, those important determinations should be made by the Texas state courts, where this case originated.

## CONCLUSION

The motion for summary judgment filed by Jarrett and Bridges (Dkt. 20) is **GRANTED**.

The motion for summary judgment filed by TDCJ (Dkt. 17) is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 and **DENIED AS MOOT** as to Plaintiff's claims under the Texas Tort Claims Act.

Plaintiff's claims under the Eighth and Fourteenth Amendments to the United States Constitution are **DISMISSED WITH PREJUDICE**. The Court declines to exercise supplemental jurisdiction over Plaintiff's claims under the Texas Tort Claims Act, and Plaintiff's claims under the Texas Tort Claims Act are **REMANDED** to the 278th District Court of Madison County, Texas.[7]

---

[7] The state-court case is cause number 19-16359 in the 278th District Court of Madison County, Texas.

The Clerk is directed to provide a copy of this order to the parties. The Clerk is further directed to send a certified copy of this order via certified mail, return receipt requested, to the District Clerk of Madison County, Texas and the Clerk of the 278th District Court of Madison County, Texas.

SIGNED at Houston, Texas, this 15th day of March, 2021.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE